MilligAN, J.,
delivered the opinion of the court:
This action is founded on a charter-party, entered into on the 6th March, 1S62, by and between Quentin M. Thorne, owner of *246 the steamer Rescue, and Henry C. Hodges, captain and assistant quartermaster, for the United States, whereby the said steamer was chartered to the United States for the full term of one month from the date of the charter-party, “ and as much longer as said vessel may be required by the United States War Department.”
The facts necessary to a decision of this case are found to be as follows:
1. The charter provides that the boat’s compensation shall be $50 per day for each and every day said vessel shall be employed, (the United States furnishing’ fuel,) from the date of the charter-party, “ until the said vessel is returned to the said party of the first part,' in the same order as when received, common wear and tear excepted; to become due, owing, and payable in the manner and form following — that is to say, payable to the order of Quentin M. Thorne, at the quartermaster’s office of the United States, at New York, upon presenting certificates of the duly authorized ag’ent of the Quartermaster’s Department, that said vessel has faithfully performed her part of this contract.” ,
2. The vessel went into the service of the government, under this charter-party, and was duly paid, as the claimants admit in their petition, the stipulated price of her wages up to the 1st August, 1863.
3. The following order was subsequently issued from the Quartermaster General’s office:
“ Quartermaster General’s Oeeice,
“ Washington, D. 0., September 9, 1863.
“ Major : • * * * The account of the steamer Rescue, from June 5 to July 31, 1863, inclusive, at $50 per day, less time lost, three days, at $50, is in like manner referred to you for payment, in accordance with the evidence of service inclosed.
‘‘The claim for pilotage, two months, at $75 per month, is hereby disallowed, not being authorized by the terms of the charter-party, nor is it deemed essential that they should be retained on board. Vessels of larger capacity are offered at $40 per day, without making any charge for pilotage. The *247 rate of this tug must be reduced accordiug to, at the most, $40 per day, from August 1, 1863, or the boat discharged.
“ By order.
•‘Very respectfully, your obedient servant,
“E. E. CLARY,
“ Golotiel and Quartermaster.
“Major Stewart Van Vliet,
“ Quartermaster, Neiv York.”
4. A similar order, bearing date “ Quartermaster General’s Office, September 8th, 1863,” is indorsed on the charter-party, which declares:
“The rate of this tug ordered to be reduced to $40 per day, commencing August 1st, 1863.
“ By order.
“R. E. CLARY,
“ Colonel and Quartermaster.”
The exact time when this indorsement was made does not distinctly appear; but we find it was not entered until or subsequent to the 9th December, 1863, which is the date of the preceding indorsement on the charter of payment for the boat’s services for the month of October, 1863.
5. In like manner the date o'f notice of the reduction of the vessel’s w-ages -from $50 to $40 per day does not very distinctly appear. But we find that, the notice was not fully communicated to the claimant until the 8th October, 1863, when the owner received and receipted for the first payment of the vessel at the reduced rate.
6. At this date, when tbe boat’s ivages were paid for the month of August, the claimant objected to the reduction, and demanded of Captain Orilly, the assistant quartermaster and disbursing officer at New York, the discharge of his boat, and was told by Captain Crilly that he had no control over the vessel. She ivas then, in i>oiut of fact, at Fortress Monroe, and beyond his jurisdiction. It further appears in proof that when the claimant, Thorne, complained to Captain Orilly of the reduction in the wages of the boat, he said- to him, “ I cannot assist you in this case, Mr. Thorne; there is the order from the Quartermaster General; we are obliged to abide by that.”
7. No further steps appear to have been taken by the owners to obtain possession of their boat; and on the same day (Octo *248 ber 8th, 1863) oil which the objection to the account was made by Mr. Thorne he received and receipted for the wages of the boat for the month of August, at $40 per day. And again on the 31st October and the 9th December, 1863, he received and receipted for the wages of the boat respectively for the months of September and October, at the reduced rate of compensation, without objection or complaint.
8. On the 15th October, 1863, the claimants sold out their interests in the Rescue to Morgan and Rheinheart, who subsequently entered into a new charter-party with the United States for the same vessel at $40 per day.
9. No further demand or effort for the discharge of the vessel appears to have been made by the owners after the date of the notice of reduction, or any release for her wages given at or subsequent to that time. The whole matter rested quietly, without demand of further payment than the $40 per day, until the institution of this suit in 1869.
The claim made in the petition'is for $760, which is alleged to be still due on the contract of charter for the services of the boat from the 1st of August to the 16th of October following, when she was sold to Morgan and Rheinheart.
The questions presented in this record are neither difficult nor novel. They are of the same character of those involved in several other vessel cases determined at the present term of this court.
It is clear, as we have decided in several other similar cases, that the Quartermaster General could not arbitrarily change the terms of the written contract, or lawfully make his order of reduction retroactive, without the concurrence of other contracting parties. He had the right, by the terms of the contract, after the expiration of one month from the date of the charter-party, to discharge the vessel at any time. He was authorized to end the contract, but he could not arbitrarily change it.
But this is not conceived to be the controlling question in the case. It is essential first to ascertain the legal effect of the claimant’s conduct in respect to the order of the Quartermaster General requiring Major Yan Yliet to reduce the wages of the boat $10 per day from the 1st August, 1863, or to discharge the vessel. Was this order acquiesced in, either directly by the claimants or impliedly by their conduct at the time or subsequent thereto ? On this question the case turns, and a majority *249 of the court are satisfied that the acts and conduct of the claimants estop them from prosecuting this action. '
The law on this subject, as laid down by Parsons on Contracts, (vol. 2, 340, g.,) is stated in the following language: “When a man has made a declaration or representation, or caused^ or in some cases not permitted, a false impression, or done some significant act with intent that others should rely and act thereon, and upon which others may have honestly relied and acted, he shall not be permitted to prove that the representation was false or the act unauthorized or ineffectual, if injury would occur to the innocent party, who had acted in full faith in its truth or validity.”
The rule is also stated thus in other authorities: “To constitute an estoppel in pais a party must have subsequently made an admission inconsistent with the defence or claim which he proposes to set up, and with his knowledge and consent another party must have so acted on that admission, that he will be injured by allowing the admission to be disproved; and this injury must be co-extensive with the estoppel.” Smith v. Schrce-der, (U. S. C. C., Rhode Island, 21 Law Rep., 739.) Dyer v. Cady, (20 Conn., 563.) Cambridge Savings Bank v. Littlefield, (6 Cash., 210.)
And this admission may be implied from the acts or conduct of the party. Lawrence v. Brown, (1 Seld., 394;) Dezell v. Odell, (3 Hill, 215 ;) Wuscott v. Davis, (4 Bar., 493;) Dewey v. Field, (4 Met., 383; 6 Peck, 455.)
Now, do the facts of this case bring it under the principles of law announced1? We think they do. It is admitted the notice of the Quartermaster G-eneraPs order was brought home to the claimants on the 8th ^October, 1863, when the wages of the boat for the months of August, September, and part of October were due. The order itself presented to the claimant the alternative of accepting its terms, or submitting to the discharge of their boat. Phey were free to take either horn of the dilemma, but could not hold on to both. They elected to accept the reduced rate of compensation, and to continue their vessel in the service, and they must be held to their own election.
There can be no reasonable doubt, had they acted otherwise their vessel would have been discharged, and they left to their remedy at law for the unpaid balance drie on the original con *250 tract.' The retroactive feature of the Quartermaster General’s order was felearly illegal and inoperative, and this fact, by presumption of law, was fully known to the claimants, as well also as the fact that this court was open to compel the government to a full compliance with the terms of their contract. The remedy was as plain and open in the one case as the Quartermaster’s order was direct and positive in the other. There could have been no misunderstanding, and the claimants failing to take the necessary steps to reclaim their boat, or to prosecute the demand for its discharge to any one having authority to return it, must be held to have elected to leave it in the service under the terms of the order.
This view of the case is corroborated by the fact that they afterward again and again received and receipted for her wages at the reduced rate of compensation, without murmur or complaint. The receipts of themselves are subject, as we have repeatedly holden, to explanation, and when explained do not work an estoppel; but when coui>led with the fact that the claimants did not prosecute their demand for the discharge of the vessel before any one but Captain Clary, the disbursing agent at New York, who declared he had no authority over it, they become important instruments of evidence to establish an acquiescence in the Quartermaster’s order.
It must also be observed that the Quartermaster General’s order was addressed to Major Orilly, and he, on the face of the order, was charged with .its execution, and not Captain Clary, to whom the claimant, Thorne, appealed for the discharge of his vessel, and who promptly informed him'he had no control over it, and that he could not go beyond the quartermaster’s orders, and “there is the order.” Thorne did not further prose-ecute Ms demand for the discharge of the boat, or even apply to Major Orilly, who by the order had authority to act in the premises, but accepted her wages and receipted for them at the reduced rates.
It is true the owners soon afterward sold the boat, but that cannot change, in the slightest degree, the legal consequences of their acts at the time of the notice of the order to reduce her rates or discharge the vessel. The defendants had then acted on their acquiescence in the terms of the order, and returned the boat, and no subsequent action of the owners, in which the defendants had no participation, could change the legal rights *251 of tbe parties subsequently fixed. The act was done, and now injury would accrue to the defendants to allow the claimants to disprove their own conduct, upon which the government acted in good faith, in retaining' the boat.
The petition must be dismissed, and the claimants go hence without taking anything by their action.